**MILLER et al. v. UNITED STATES.**

No. 45821.

Court of Claims.

Oct. 1, 1945.

This case having been heard by the Court of Claims, the court, upon the evidence and

the report of a commissioner, makes the following special findings of fact:

1. Plaintiff, Anthony P. Miller, is a resident of Pleasantville, New Jersey, and plaintiff, Anthony P. Miller, Incorporated, is a New Jersey corporation with its principal place of business in Atlantic City. Both plaintiffs are now and were at all times hereinafter mentioned engaged in the general contracting business. Plaintiff, Anthony P. Miller, owns 60 percent of the stock of plaintiff, Anthony P. Miller, Incorporated, the balance being owned by his wife and children. He is and was president of that corporation and manages and controls it.

2. October 10, 1942, the National Housing Agency, Federal Public Housing Authority, hereinafter sometimes referred to as the "Authority," issued an invitation for bids for the construction of a housing project near Hatboro, Pennsylvania, which read as follows:

"Sealed Bids, in triplicate, subject to the conditions contained herein, and the Contract Documents, will be received until 2 P.M. o'clock on October 22, 1942, and then publicly opened at the Federal Public Housing Authority, 270 Broadway, New York City, for furnishing all labor and materials and performing all work for the construction of War Housing Project PA36258, Upper Moreland Township near Hatboro, Montgomery County, Pennsylvania.

"Attention is called to the fact that the minimum wage rates as set forth in the Contract Documents must be paid on this project. Forms of contract documents, including specifications and drawings are on file at the office of Silverman and Levy, Architects Building, 17th and Sansom Streets, Philadelphia, Pennsylvania, and may be obtained by the deposit of $50.00 for each set to assure its return in good condition within 10 days after opening of bids. The right is reserved, as the interest of the Government may require, to reject any and all bids and to waive any informality in bids received.

"Receipt of this notice of bids by any contractor shall not be construed as an admission by the Government of such contractor's qualifications to perform the work contemplated by the bids.

"Bid security in the form of a money order, certified check, or cashier's check made payable to the Treasurer of the United States, or a satisfactory bid bond on U. S. Standard Form No. 24, in an amount not less than two percent (2%) of the bid will be required.

"Attention is also called to the fact that the cost of performance and Payment Bonds shall not be included in the lump sum bid."

3. Included in the instructions to bidders as a part of the contract documents were the following provisions:

"8. Bid and Performance Guarantees

\* \* \* \* \* \*

"(4) Bids in excess of $2,000 shall be accompanied by a bid guarantee of not less than two per cent (2%) of the amount of the bid, which may be: Bid Bond on U. S. Standard Form No. 24, Money Order, Certified Check or Cashier's Check, made payable to the Treasurer of the United States. Such money order or check shall be submitted with the understanding that it shall guarantee that the bidder will not withdraw his bid within thirty days after the date of the opening of the bids; that if his bid is accepted he will enter into a formal contract with the Government, and give bonds as may be required; and that in the event of the withdrawal of said bid within said period, or the failure to enter into said contract and give said bonds within the time specified, the bidder shall be liable to the Government for the difference between the amount specified in his bid and the amount for which the Government may otherwise procure the required work, if the latter amount be in excess of the former, and the Government shall have the right to retain the proceeds of said money order or check to apply on account of such excess cost. Money orders and checks of unsuccessful bidders will be returned when award is made; that of the successful bidder will be returned when formal contract and bonds are approved.

\* \* \* \* \* \*

"9. Time for Receiving Bids

"(1) Bids received prior to the time of opening will be securely kept, unopened. The officer whose duty it is to open them will decide when the specified time has arrived, and no bid received thereafter will be considered; except that when a bid arrives by mail after the time fixed for opening, but before the award is made, and it is shown to the satisfaction of the officer authorized to make the award that the nonarrival on time was due solely to delay in the mails for which the bidder was not responsible, such bid will be received and con-

sidered. No responsibility will attach to an officer for the premature opening of a bid not properly addressed and identified. Unless specifically authorized, telegraphic bids will not be considered, but modifications by telegraph of bids already submitted will be considered if received prior to the hour set for opening: Provided, That such modifications are confirmed in writing over the signature of the bidder within 48 hours thereafter; Provided further, That the Government may, in its discretion, waive failure of the bidder to so confirm such modifications.

"(2) Bidders are cautioned that, while telegraphic modifications of bids may be received as provided above, such modification, if not explicit and if in any sense subject to misinterpretation, shall make the bid so modified or amended subject to rejection.

"(3) Bidders are cautioned to allow ample time for transmittal of bids by mail or otherwise. Bidders should secure correct information relative to the probable time of arrival and distribution of mail at the place where bids are to be opened; and, so far as practicable, make due allowance for possible delays in receipt of bids.

"10. Withdrawal of Bids

"Bids may be withdrawn on written or telegraphic request dispatched by the bidder in time for delivery in the normal course of business prior to the time fixed for opening; Provided, That telegraphic withdrawal is confirmed in writing over the signature of the bidder within 48 hours thereafter. Negligence on the part of the bidder in preparing the bid confers no rights for the withdrawal of the bid after it has been opened.

"11. Bidders Present

"At the time fixed for the opening of bids, their contents will be made public for the information of bidders and others properly interested who may be present either in person or by representative.

"12. Award of Contract—Rejection of Bids

"The contract will be awarded to the lowest responsible bidder complying with the conditions of the invitation for bids, provided his bid is reasonable and it is to the interest of the Government to accept it."

4. Pursuant to the instructions set out above, plaintiffs, on October 21, 1942, mailed to the Federal Public Housing Authority, 270 Broadway, New York, N. Y., their bid in the sum of $693,000, plus $7,500 in addition for the cost of the bond should the Authority desire it. The Authority received that bid at or prior to 2 p.m. on October 22, 1942. The bid contained the following provision:

"If written notice of the acceptance of this bid is mailed, telegraphed or delivered to the undersigned within thirty days after the date of opening of the bids, or at any time thereafter before this bid is withdrawn, the undersigned agrees that he will execute and deliver a contract in the form attached to the Instruction to Bidders (U. S. Standard Form No. 23, Revised) as required by the Contract Documents, in accordance with the bids as accepted, and that he will, if required, by the Government, give performance and payment bonds as specified, with good and sufficient surety or sureties, all within five days (unless a longer period is allowed) after the prescribed forms are presented to him for signature."

With the bid, and referred to therein, was forwarded the bid bond on a standard Government form in the amount of $15,000, executed by plaintiffs, as principals, and by the Seaboard Surety Company of New York, as surety. The bond contained the following provision:

"Now, Therefore, if the principal shall not withdraw said bid within the period specified therein after the opening of the same, or, if no period be specified, within sixty (60) days after said opening, and shall within the period specified therefor, or, if no period be specified, within ten (10) days after the prescribed forms are presented to him for signature, enter into a written contract with the Government, in accordance with the bid as accepted, and give bond with good and sufficient surety or sureties, as may be required, for the faithful performance and proper fulfillment of such contract, or in the event of the withdrawal of said bid within the period specified, or the failure to enter into such contract and give such bond within the time specified, if the principal shall pay the Government the difference between the amount specified in said bid and the amount for which the Government may procure the required work and/or supplies, if the latter amount be in excess of the former, then the above obligation shall be void and of no effect, otherwise to remain in full force and virtue."

5. In accordance with provisions contained in invitations for bids, plaintiffs had usually on prior similar occasions submitted

telegraphic modifications of their bids. When the bid involved in this case was submitted, plaintiffs had anticipated that such a modification might be made on account of the receipt of delayed proposals from subcontractors which might make necessary either an increase or decrease in their submitted bid. In this instance proposals were received from subcontractors after plaintiffs' written bid was mailed and as a result plaintiffs at or about 12:43 p.m. on October 22, 1942, delivered to the Western Union Telegraph Office in Atlantic City, New Jersey, for transmission to New York City, the following telegram:

"RXMHA125 31/28—Atlantic City NJ 22 12 32P

"National Housing Agency—

"DLR Before 1 45 PM Federal Public Housing

"Authority Room 2811 270 Broadway NYK—Reduce the basic bid price of our bid on the construction of war housing projects PA36258, dated October 22nd 1942 by the amount of $50,000.00 (fifty thousand dollars)

"Anthony P Miller and Anthony P Miller Inc."

A telegram sent from Atlantic City, New Jersey, at 12:43 p.m. would normally reach the addressee in New York City before 2 p.m. on the same day, and this telegram was sent by plaintiffs with the expectation that it would be delivered by that time. However, when it was delivered to the Western Union Office in Atlantic City that office, in accordance with the custom at that time, refused to guarantee the time of delivery.

6. The telegram referred to in the preceding finding was received at the main office in New York City of the Western Union Telegraph Company at 12:49 p.m. on October 22, and was by that office forwarded to its branch office at 306 Broadway, where it was received at 1:07 p.m. Due to a shortage of messengers, the telegram was not sent from the branch office until 2 p.m., at which time it was sent, together with nine other telegrams, all of them for delivery by the same messenger boy within three blocks of the branch office. As will hereinafter appear, that telegram was not received by the Housing Authority until after the opening of the bids.

7. C. O. Skinner of the Housing Authority was in charge of the opening of bids which took place in the conference room on the fourteenth floor of the offices of the Authority at 270 Broadway, New York City. The bids, five in all, were opened promptly at 2 p.m. on October 22, 1942, and the amounts read aloud by Mr. Skinner. The time spent in the opening and reading of the bids was between five and ten minutes. Plaintiffs' bid in the amount of $693,000, with an additional $7,500 if bond was required, was the lowest bid and the next bid was some $4,000 higher. No telegrams modifying the bids of any bidders were read. In accordance with the practice of the Authority, although the bids were read aloud, no formal statement was made as to which was the low bid and no award was made at that time.

After the bids had been read, a representative of the Authority inquired whether a representative of plaintiffs was present and Howard Hager, a bonding agent, came forward. Hager had attended the opening of bids at the request of plaintiffs but had no authority from plaintiffs to take any action in regard to plaintiffs' bid other than to report what occurred at the opening, and he advised one of the Authority's representatives of his lack of authority to speak for plaintiffs. At that time one of the Authority's representatives discussed with Hager the preparation of a breakdown of plaintiffs' bid on the basis of the amount of $693,000 which had been read at the opening and later plaintiffs submitted a breakdown on that basis.

8. About 2:15 p.m. Hager telephoned from a public telephone in the building where the bids had been opened, to plaintiff Anthony P. Miller in Atlantic City advising him that plaintiffs' bid in the amount of $693,000 as read at the opening was the low bid. Miller asked Hager whether the telegram referred to in finding 5 had been read at the opening and, upon being told that it had not, Miller instructed Hager to make inquiry as to whether the telegram had been received. Up to that time Hager had no knowledge that plaintiffs had sent such a telegram. Upon returning to the room where the bids had been opened and being told by Skinner that no telegram had been received so far as he knew, Hager then telephoned that information to Miller in Atlantic City, and Miller instructed Hager to tell the representatives of the Authority to disregard the telegram when they did receive it as it had been sent in error.

9. When Hager returned from his second conversation with Miller, an air raid

drill, which began at 2:30 and continued until 2:40, was in progress. During the drill the employees of the Authority assembled in the corridors of the building on the floors outside their respective offices. Immediately after the drill ended, Hager met Skinner in the corridor on the fourteenth floor and advised Skinner that plaintiffs had instructed him to advise the Authority of their withdrawal of their telegram modifying their bid and that the Authority was to ignore it. That conversation was concluded by about 2:45 p.m. At that time the telegram modifying the bid and referred to in finding 5 had not been received by the Authority.

10. After Skinner had returned to his office on the twenty-eighth floor, his secretary informed him shortly after three o'clock that she had received a telephone call from another office to the effect that the telegram in question had been received. The telegram was sent immediately by special messenger to Skinner's office and had stamped thereon the time of receipt as 3 p.m., or two or three minutes thereafter. That stamp was placed thereon upon its receipt in the receiving room, or within five minutes after such receipt, and prior to its delivery to Skinner.

11. At 4:27 p.m. on October 22, 1942, plaintiffs sent the following telegram to the Housing Authority which was not received by the Authority until about 10 a.m. on October 23, 1942:

"Request you disregard our previous telegram of today concerning war housing project Pa 36258 as same was not received prior to hour set for opening of bids as required by specifications."

Plaintiffs sent no written confirmation of the above telegram.

12. November 6, 1942, the Authority wrote plaintiffs as follows:

"Reference is made to your bid submitted on October 22, 1942, as amended by your telegram of the same date for the construction of War Housing Project Pa-36258, Upper Moreland Township, near Hatboro, Pa.

"This is written Notice of Acceptance of your lump sum bid submitted on that date in the amount of $693,000, modified by your telegram of the same date for a reduction of $50,000, making a net amount of $643,000. To this amount will be added the actual cost of furnishing Performance and Payment Bonds, which cost shall not exceed $7,500, as indicated in your bid. The net amount of award, therefore, shall not exceed $650,500.

"The contract is now being prepared in this office and you will be notified as soon as possible when it is ready for signature. In the meantime, you are requested to obtain promptly four signed and four conformed copies of the necessary Performance and Payment Bonds."

13. At the time of the events hereinabove referred to, Raymond J. Roth was regional counsel for the Housing Authority and Thomas A. Burns was principal attorney for that organization. One of the duties of Burns was to review legal work which passed through his office before consideration by Roth. Before writing the letter of November 6, 1942, referred to in finding 12, Roth and Burns had made an investigation as to the delivery of the two telegrams which had been sent by plaintiff on October 22, 1942. In considering the effect to be given to these telegrams it was Burns' opinion that the telegraph company was the agent of the Government and that accordingly the first telegram should be considered as having been received by the Housing Authority at the time it was delivered to the telegraph company in Atlantic City at 12:43 p.m. on October 22, 1942, and that there had been no effective revocation of that telegram. On that basis Burns approved a memorandum opinion on October 29, 1942, for Roth's signature with respect to the bid to be used in the preparation of the contract. Roth signed that memorandum which contained the following paragraph:

"I have caused an examination to be made of the material outlined above, and it is my opinion that the same is legally unobjectionable and that the bid submitted by Anthony P. Miller and Anthony P. Miller, Inc., is acceptable. This latter bid, you will no doubt recall, was originally submitted in the amount of $693,000, and thereafter a telegram authorized a deduction of $50,000. Under the circumstances, the telegraphic modification operated effectively to reduce the original 'Miller' proposal so that it represented an offer to construct the proposed improvements for the sum of $643,000."

14. Upon receipt of the above opinion, John K. Leonard, the employee in the Housing Authority charged with the preparation of contracts, prepared a form of contract in accordance with that opinion which showed the contract price as $643,000, and notified Miller by telephone to

come to New York on November 12, 1942, for the purpose of signing the contract.

15. Pursuant to that notification, Miller and certain employees of plaintiffs' organization came to New York on the morning of November 12, 1942. Among those accompanying Miller was Thomas M. Munyan, plaintiffs' attorney. Upon being shown the contract with the contract price appearing therein as $643,000, Miller made known his dissatisfaction with that contract price. Munyan conferred with Roth and Burns in regard to the contract price and in that conference Munyan urged that the telegram reducing the original bid had been revoked prior to its delivery to the Housing Authority and that therefore the only bid of plaintiffs which was before the Housing Authority was the original bid of $693,000. At the time of this conference, the Government was desirous of getting the work started which was covered by the contract. The only item in controversy at that conference was whether the contract price should be $643,000 or $693,000, the defendant's representatives insisting upon the former and plaintiffs' representatives upon the latter. In order to give plaintiffs an opportunity to establish, if it was legally possible, that the correct contract price, based upon the amount of plaintiffs' effective bid, was $693,000, without being prejudiced by having signed the contract showing the contract price as $643,000, the suggestion was made that a paragraph be prepared and inserted in the contract which would save plaintiffs' rights in that respect. In the discussion of the proposed reservation Roth contemplated the possibility of setting up a $50,000 contingent fund to cover the outcome of the controversy which involved that difference in the two amounts and therefore suggested that in order to avoid accounting difficulties the parties should include in the reservation a provision requiring that plaintiffs assert their right within ninety days. Where and how plaintiffs would assert their right was not discussed. Roth instructed Burns to collaborate with Munyan in the preparation of the reservation provision.

16. Munyan and Burns thereupon left Roth's office and thereafter collaborated in the preparation of the reservation provision which is set out in finding 17 and which was incorporated in the contract. After they completed it, Munyan explained his understanding of it to Miller in the presence of Burns as being in substance that in the event it could be shown that the first telegram sent by Miller was revoked prior to its receipt by the Housing Authority the contract price would be $693,000, but that in the event there was no effective revocation the contract price would be $643,000. Miller then indicated that the provision as drafted was satisfactory to him. Burns was satisfied that the provision was not harmful to the defendant's interests but made no comment as to its effect. Munyan and Burns took the reservation provision to Roth who approved it. Shortly thereafter it was delivered to Leonard who had it incorporated in the contract. Miller thereupon on the same day signed the contract which contained the reservation provision.

17. In the contract, plaintiffs for a consideration of $643,000, plus the cost of bonds, not to exceed $7,500, agreed to furnish the materials and perform the work of constructing the Housing Project involved in their bid in accordance with the Government's specifications and drawings. The language of the reservation was as follows:

"Notwithstanding anything to the contrary herein, it is mutually understood and agreed by and between the parties hereto that neither the execution of this Contract nor any action taken thereunder, nor the recital of the contract sum herein, shall constitute or be construed as a waiver by the contractors of any right which the said contractors might have to establish, by such lawful process as the said contractors shall deem expedient, the true contract price to be the sum of $693,000, being the amount of the written bid submitted plus the cost of the Performance and Payment Bonds as hereinbefore stated. The government grants the aforesaid right of action to the contractors and shall not interpose the defense of waiver or estoppel.

"It is further mutually understood and agreed by and between the parties hereto, however, that any action taken by the contractors for the purpose aforesaid must be instituted within ninety days from the date hereof."

The work under the contract was duly commenced by plaintiffs and is now completed. This suit was filed February 6, 1943.

John W. Gaskins, of Washington, D. C. (King & King, of Washington, D. C., Thomas H. Munyan, of Atlantic City, N. J., and Harry D. Ruddiman, of Washington, D. C., on the brief), for plaintiff.

Philip Mechen, of Iowa City, Iowa, Newell A. Clapp, of Chicago, Ill., and Francis

M. Shea, Asst. Atty. Gen. (Horace G. Marshall, of Chicago, Ill., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

On October 10, 1942, the National Housing Agency, Federal Public Housing Authority, hereinafter for brevity referred to as the Authority, invited bids for the construction of a war housing project at Hatboro, Pennsylvania. The invitation stated that bids would be opened at the Authority's office at 270 Broadway at 2 P.M. on October 22. On October 21, the plaintiffs mailed a letter from Atlantic City, New Jersey, which was their principal place of business, to the Authority, containing a bid of $693,000. This letter arrived in time for the opening of bids.

The instructions to bidders, which were sent by the Authority to prospective bidders, and pertinent parts of which are quoted in finding 3, contained in section 9 (1) a provision that telegraphic modifications of bids already submitted in writing would be considered if received by the Authority prior to the hour set for the opening of bids. This provision, which was usual in invitations, was often made use of by bidders, including the plaintiffs, when bidding for Government contracts. It enabled them to set their final bids on the basis of late offers received by them from prospective subcontractors, and of late information concerning prices. The plaintiffs, having received late offers from subcontractors justifying a reduction of their mailed bid, sent a telegram at 12:43 P.M. on October 22 reducing their bid by $50,000. The plaintiffs very strongly desired that this telegram should reach the Authority before 2 P.M., and sought to have the telegraph company guarantee that it would do so. The company would not so guarantee, and in fact the telegram was not delivered to the Authority until about 3 P.M.

At 2 P.M. the bids, of which there were five, were opened by a Mr. Skinner in the conference room of the Authority's offices in New York, and the amounts of the bids were read aloud to those present. The plaintiffs' bid of $693,000 was lowest, the next one being $4,000 higher. A Mr. Hager of Philadelphia, who was in the insurance and surety bond business, had been requested by the plaintiffs to attend the opening to observe and report what happened. After the bids had been read, Hager went downstairs to a public telephone and called the plaintiffs and advised them that their bid of $693,000 was the low bid. He was asked by the plaintiffs to find out whether their telegram modifying their bid had been received. He returned to the room where the bids had been opened, and was told by Skinner that he had not heard of any such telegram. Hager then returned to the public telephone and reported to the plaintiffs what he had learned. He was told to go back and tell Skinner to disregard the telegram when it arrived, as it had been sent "in error."

While Hager was downstairs on this errand an air raid alert had been called at 2:30, and the employees in the various offices of the building were required to assemble in the halls outside their offices. The elevators were not running and Hager climbed the stairs to the fourteenth floor where, when the alert was over at 2:40, and when Hager had recovered his breath, he told Skinner, in substance, that the plaintiffs wished their telegram to be disregarded when received, as it had been sent by mistake. This conversation was concluded by about 2:45 P.M. Skinner then returned to his office on the twenty-eighth floor of the building. Shortly after 3 o'clock his secretary told him that she had received a telephone call advising her that a telegram relating to the plaintiffs' bid had come to the Authority. Skinner asked that the telegram be sent to him immediately by special messenger, which was done. This was the telegram reducing the plaintiffs' bid by $50,000. The receiving room stamp on it showed the time of receipt as two or three minutes after 3 P.M., and it had been delivered to the Authority, at the receiving room, not more than ten minutes before that time.

The plaintiffs, at 4:27 P.M. on the same day, sent another telegram, which is quoted in finding 11, requesting the authority to disregard the telegram modifying the written bid. This telegram was not received by the Authority until the next day.

On November 6 the Authority wrote the plaintiffs that it had accepted their bid of $693,000, as reduced by their telegram, and that a contract setting the price at $643,000 was being prepared for the plaintiffs' signature. On November 12 the plaintiffs and the Authority signed such a contract, but

pursuant to discussion, inserted in it the following statement:

"Notwithstanding anything to the contrary herein, it is mutually understood and agreed by and between the parties hereto that neither the execution of this Contract nor any action taken thereunder, nor the recital of the contract sum herein, shall constitute or be construed as a waiver by the contractors of any right which the said contractors might have to establish, by such lawful process as the said contractors shall deem expedient, the true contract price to be the sum of $693,000 being the amount of the written bid submitted plus the cost of the Performance and Payment Bonds as hereinbefore stated. The government grants the aforesaid right of action to the contractors and shall not interpose the defense of waiver or estoppel.

"It is further mutually understood and agreed by and between the parties hereto however that any action taken by the contractors for the purpose aforesaid must be instituted within ninety days from the date hereof."

The construction called for by the contract has been completed. The plaintiffs are suing for the $50,000 involved in the telegram, the history of which is recited above. The plaintiffs assert that, since their telegram reducing their bid had not been received by the Authority by two o'clock, the hour set for opening bids, and since section 9 (1) of the instructions to bidders, quoted in finding 3 said "Unless specifically authorized, telegraphic bids will not be considered, but modifications by telegraph of bids already submitted will be considered if received prior to the hour set for opening:", the Authority had no right to consider their telegraphic modification, just as they would have had no right to have it considered, if their original bid had not been the low bid. The Government urges that the quoted provision was inserted for the benefit of the Government; that it could, at its option, either insist upon it or waive it; and that since the plaintiffs' bid in writing was already low, and hence no other bidder could complain, there was no reason why the Government could not accept a still lower, though belated, offer from the already low bidder. A comparable problem was involved in Leitman v. United States, Ct.Cl., 60 F.Supp. 218, and we said that, where the late telegram came from a bidder who was already low, the reason for the placing of the time limit on modifications did not apply. But in view of the facts which we have found, and the applicable law as we see it, it is not necessary to further consider that question in this case.

■ We think that the plaintiffs did not make an effective offer to reduce their written bid. They dispatched a telegram intended to make such an offer, but when they learned that the telegram had been delayed and that their written bid of $693,000 was low, they formed the intention to withdraw the offer contained in the telegram, and communicated that intention to the intended offeree, the Authority, before their offer reached it. An offer is not made until it is communicated to the offeree, and until it is made it may be withdrawn, or obliterated, by a communication expressing an intent to do so. If the willingness to contract on the basis of words previously dispatched no longer exists, and if the absence of that willingness has been brought home to the person to whom the words were dispatched, the words, when they later arrive, are empty of the substance necessary to the meeting of the minds of parties in a contract. We have found that the plaintiffs' oral message, withdrawing the offer to reduce their bid, was delivered through Hager to Skinner before the telegram was delivered to the Authority. There was, therefore, no offer to reduce the bid, made either on time or late, which the Authority could accept, either under the particular procedures by which Government contracts are made, or under ordinary contract law.

The Government contends that the provisions of the paragraph next to the last, quoted in finding 2, and of section 8 (4) of the instructions to bidders, quoted in finding 3, requiring the submission by a bidder with his bid of a bid bond, made the plaintiffs' written bid and its telegraphic modification irrevocable for thirty days, like an offer made for a consideration, or an offer under seal at common law. The plaintiffs contend that their bid was only an offer, and was therefore revocable by them without any penalty except the forfeiture of their bid bond, at any time before acceptance, which here did not take place until some fifteen days after the opening of the bids and the events relating to the telegram.

Again we do not find it necessary to resolve these contentions. The facts here do not involve the revocation of an offer, but the making or, as we have found, the nonmaking of a contemplated offer to do the

work for $50,000 less than the sum specified in an offer formerly made. Since the contemplated offer was not made, the question of the revocability of such an offer, if it had been made, will not be considered. It is true that when the plaintiffs sent the telegram reducing their written bid, they intended to modify, or pro tanto revoke, their previously made offer. But before that offer was communicated, they had changed their minds and again were willing to stand by their original offer. The Authority never having been advised of any desire on the part of the plaintiffs to revoke their $693,000 offer, indeed, having been affirmatively advised that the plaintiffs adhered to that offer, had the right to accept it within the thirty-day period named in the instructions to bidders, and thereby make a binding contract for that amount. The problems that arise here are, therefore, not problems of the revocability of offers.

As we have said, the parties signed a contract on November 12, 1942, naming the contract price as $643,000, but containing the proviso above quoted. The Government urges that this contract settles the question of price; that whether or not the plaintiff had offered to perform the contract for $643,000, it made a contract to do so, which made all the preceding events irrelevant. It says, and the plaintiffs concede, that the plaintiffs had no right, as a result of their being the low bidder at $693,000 to a contract; that the Government had not promised to award the contract to anyone. The Government further says that, the Authority having learned from the telegram that the plaintiffs were willing to do the work for $50,000 less than $693,000, whether they had effectively offered to do so or not, it would not have awarded the contract to the plaintiffs or any other bidder at $693,000, but would have re-advertised for new bids, if the plaintiffs had not been willing to make the contract for $643,000. This is speculation. To be sure, the Authority had learned something from the plaintiffs' belated telegram, but it knew that the plaintiffs had learned something from the public opening of the bids of other bidders. What the Government would have done would have, probably, depended on the trend of prices of labor and materials, and the necessity for early completion of the work, which was a war housing project. Re-advertising would have taken time, which might have been regarded as more valuable than the possibility, by no means a certainty, of saving some money.

We consider now what we regard as the essence of the case; the meaning of the special language inserted in the contract because of the problem arising out of the telegram relating to the $50,000. The plaintiffs contend that the contract is, in reality, a promise by the Government to pay either $643,000 for the work, or, if it shall be determined by suit that the Government did not have a bid, which it had a right to accept, for $643,000, but only a bid for $693,000, then to pay $693,000. The Government contends that the inserted language means only that the plaintiffs may bring a suit and that the Government will not interpose the defenses of waiver or estoppel; but that it affects in no way the balance of the contract which is a plain agreement on the part of the plaintiffs to do the work for $643,000.

Of the plaintiffs' asserted interpretation of the special language, one must say that the language is an inept way of saying what the plaintiffs say it means. As to the Government's asserted interpretation, it makes the language quite completely futile and useless, as well as somewhat self-contradictory when read in connection with the rest of the contract. Whether it is called waiver, estoppel, or something else, it comes very close to one of those concepts to be told that one paragraph of their contract, specially written and inserted, gives the plaintiffs no rights because the contract which they have signed contains other contradictory paragraphs. So we have a situation in which the meaning for which the plaintiffs contend is by no means the plain meaning of the words in question, and the meaning for which the Government contends is, in essence, no meaning at all. We must, therefore, either omit the language from our consideration altogether, or search for its meaning in the expressions of the parties at the time they formulated the cryptic language, and the background of events in which they used it.

If the Government agents who made the contract held the same beliefs as the Government lawyers express in their briefs; that the telegram was, or probably was, delivered to the Authority before it was countermanded by the sender; that it therefore constituted a bid, if the Authority chose to waive the fact of its arrival after the other bids had been opened; and that as a bid it was irrevocable for thirty days, according to the Government's interpretation of the instructions to bidders; then it would seem that the agents of the Authority in-

sisted on the $643,000 figure in the contract because they thought the plaintiffs had bid that amount. That fact would have a tendency to show that the agents of the Authority were willing, if they did not have a bid for $643,000, but one for $693,000, to pay $693,000 for the work; that they were somewhat uncertain as to which figure was the plaintiffs' effective bid, and were willing to insert the special language in the contract to permit the plaintiffs to establish, in litigation, which was the effective bid, and to express the thought that the contract price should be whatever amount should be so established. If that was what the parties meant by the special language in the contract, the plaintiffs are entitled to recover, as we have determined that the plaintiffs' only bid was $693,000.

We remanded the case for a hearing of evidence as to the intent of the representatives of the parties when they composed the reservation which was written into the contract, as shown by what they said in their conversations about it. On the basis of that evidence, we have concluded that the parties were in disagreement as to what amount the plaintiffs had effectively bid; that neither party was willing to make an unqualified contract for the amount which the other contended to be the amount of the bid; that they reached an agreement to qualify the language of the contract so that it would permit the plaintiffs to establish the bid price, which would thus be the contract price, by litigation, in which the disputed facts relating to the telegram could be resolved, and the correct rules of law could be applied to them.

We therefore construe the ambiguous special language in the contract of November 12, 1942, as intended to mean that the price should be $643,000, or $693,000 if that sum should be shown by litigation to be the plaintiffs' bid. We have concluded above that the plaintiffs' bid was $693,000. That was, therefore, the price which the Authority promised to pay for the work. It follows that the plaintiffs may recover $50,000.

It is so ordered.

WHALEY, Chief Justice, and WHITAKER and LITTLETON, Judges, concur.

JONES, Judge, took no part in the decision of this case.