**B.E. MEYERS & CO., INC., and Brad E. Meyers, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

No. 97–120C.

United States Court of Federal Claims.

July 21, 2000.

D. William Toone, Bellevue, Seattle, WA, for plaintiffs.

Chun–I Chiang, with whom were Assistant Attorney General Frank W. Hunger, Director Vito J. DiPietro, and John Fargo, U.S.

Department of Justice, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

Pending are cross-motions for summary judgment on the validity of plaintiff's patent No. Re. 33,572. Plaintiff[1] seeks damages from the United States based on alleged infringement of its patents on certain night-vision devices. Defendant moves for summary judgment, asserting that most of plaintiff's claims should be dismissed because the patents which were allegedly infringed are invalid. Plaintiff has responded by filing a cross-motion seeking to establish the validity of the disputed patents. Oral argument took place on March 31, 2000, after which the court ordered supplemental briefing. The briefing is now complete, and further argument is deemed unnecessary. For the reasons set out below, plaintiff's cross-motion for summary judgment is granted in part and denied in part. Defendant's cross-motion is denied.

## FACTUAL BACKGROUND

Plaintiff is a manufacturer of various night-vision devices. Among these devices are items referred to by the parties as "infrared illuminators." The early versions of these devices were essentially high-powered flashlights, with infrared ("IR") filters used as lens caps, mounted atop a viewer. The later version, referred to by the parties as the second generation illuminator, abandoned the use of the flashlight/IR filter combination. Instead, the illuminator housed an IR Light Emitting Diode ("LED") which projected an infrared beam through a lens system that focused the infrared light. The entire system was encased in a housing and then mounted atop a viewer that allowed the user to see objects illuminated by the infrared beam. In the original patented version of plaintiff's device, the IR LED was designed to pulse on and off while in operation,

in order to prevent the diode from burning out.

Plaintiff later sought to have patent No. 572 reissued in broader form, alleging that the original patent was too narrow in that it included limitations related to the pulsing of the IR LED within the original patent's broadest claim. In its reissue application, plaintiff indicated that it believed its lens system capable of "forming the energy from [a source of electromagnetic radiation] into a beam with a well defined peripheral edge" was in fact a separate invention that qualified for independent protection, regardless of whether particular pulsing circuitry was used to control the power supply to the IR LED. Plaintiff's reissue application was ultimately granted after being reviewed by the same Patent and Trademark Office ("PTO") examiner who dealt with plaintiff's original claim.

In its motion, defendant attempts to show that plaintiff's re-issue patent for the illuminator is invalid for several reasons. It first asserts that plaintiff violated the "on-sale bar" rule of 35 U.S.C. § 102(b) (1994) by offering to sell the patented device more than one year before it actually applied for patent protection. Second, it claims that plaintiff improperly used the reissue process to "recapture" subject matter that it surrendered in order to distinguish its device from other pre-existing inventions during the original patent application process. Third, it argues that plaintiff's reissue claims are invalid because they do not cover the same device described in plaintiff's disclosure in connection with its original patent application. Finally, it asserts that plaintiff's reissue claims are invalid because plaintiff's reissue declarations are not sufficiently detailed. Plaintiff cross-moves for summary judgment, arguing that defendant's theories are without merit, and that, because defendant has not pointed to further flaws in its patent, the court should declare the patent valid.

Plaintiff's statement of genuine issues identifies a number of defendant's proposed facts with which it disagrees. As defendant correctly points out, many of plaintiff's "gen-

1. Brad E. Meyers is founder and president of Brad E. Meyers, Inc. ("BEM"). Mr. Meyers himself, as well as BEM, appear as parties in this action. They will be referred to collectively as "plaintiff."

uine issues" simply quibble with the phraseology of defendant's proposed facts. There are, however, sufficient disputes of material fact in connection with defendant's first and third theory to render summary judgment inappropriate for either party. As for defendant's remaining two theories of invalidity, the court concludes that summary judgment in favor of plaintiff is appropriate.

## DISCUSSION

■ Patents are presumed valid. *See* 35 U.S.C. § 282 (1994). Defendant thus bears the burden of establishing invalidity by clear and convincing evidence. *See Akzo v. E.I. Du Pont de Nemours,* 810 F.2d 1148, 1150–51 (Fed.Cir.1987). Defendant also bears the burden of proof in challenging plaintiff's reissue claims, because of the deference given to decisions of the patent examiner. *See id.; American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1359 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

*On–Sale bar*

■ The on-sale bar, found in 35 U.S.C. § 102(b), prohibits the patenting of an invention that had been on sale in the United States for more than one year prior to the date of the application for the patent. The date that is one year prior to the date of the application for the patent is referred to as the "critical date." *See Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 57, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). A two-prong test is used to determine whether an on-sale bar exists. *See Pfaff,* 525 U.S at 67, 119 S.Ct. 304. The party challenging the patent must prove by clear and convincing evidence (1) that the product embodying the claimed invention was the subject of a commercial offer for sale prior to the critical date, and (2) that the claimed invention was ready for patenting when it was offered for sale. *See id.* at 67, 119 S.Ct. 304. The second prong can be satisfied in at least two ways: (i) by proving that the invention was reduced to practice prior to the critical date, which means that the invention worked for its intended purpose, or (ii) by proving that prior to the critical date, the inventor prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention. *See id.* at 67–68, 119 S.Ct. 304.

■ Defendant alleges that plaintiff offered its patented illuminator for sale prior to the critical date of January 30, 1984. Defendant also alleges that plaintiff had reduced its patented illuminator to practice prior to the critical date, and that subsequent improvements made by plaintiff after the critical date do not mean that the illuminator did not work for its intended purpose at an earlier time.

Plaintiff contends that it did not make a commercial offer for sale of the illuminator prior to February 1984, and that even if it had, the device was not ready to patent until 1984. Defendant presents several different examples of what it contends were commercial offers for sale, and plaintiff seeks to rebut each one. Its primary argument, however, is that defendant's examples are misdirected due to understandable confusion about the precise product being offered at particular times. This is because, even as the underlying technology for infrared spot illuminators advanced and evolved, the terms used to describe the devices, namely infrared spot illuminators or IR illuminators, remained the same. For this reason, according to plaintiff, references to IR illuminators in plaintiff's 1983 correspondence with customers do not necessarily indicate that the product being referred to is the specific IR illuminator for which BEM eventually sought and received patent protection.

The first example of an alleged commercial offer for sale relied on by defendant is based on an August 31, 1983 letter from BEM to a Mr. Killion. The relevant portion of this letter indicates that BEM is offering Mr. Killion a new product not yet described in BEM marketing brochures:

> There is one product we have just completed that you will not find a flyer on. However, I think you would find it appealing so I will describe it to you. It is a 2nd generation night vision device similar to the Noctron V. It is a more compact package made to accept camera lenses of your choice, has a 2″ viewscreen on the

back, and comes with a near-infrared spotlight attached to the side. The spotlight provides added illumination in minimal light situations. The total package sells for $2,995.00.

The parties vigorously dispute whether the "near-infrared spotlight" mentioned in this letter is a first generation flashlight with an IR filter, or the second generation illuminator with an IR LED. The latter is the device that was ultimately patented by BEM. If it referred to the former, then the letter to Mr. Killion was not an offer to sell the patented device. If it was the latter, however, then the letter was an offer to sell the patented device, and the only issue remaining would be whether the device itself was ready to patent at some time prior to the critical date.

Defendant points out that the reference to a new product in the Killion letter encompasses both the viewer and the near-infrared spotlight. It points to exhibits of earlier BEM product brochures, which offered to sell a flashlight and an IR filter, and which referred to these items as an "infrared and white illuminator." These exhibits show that the flashlight and IR filter were priced and sold separately. This shows, according to defendant, that the near-infrared spotlight reference in the Killion letter had to be something other than the flashlight and IR filter, because the Killion letter is discussing a new product not illustrated in BEM brochures, yet the flashlight and IR filter had been offered and sold in BEM brochures since at least 1982.

Defendant also relies on deposition testimony from a Mr. George Luginbill, a former BEM sales representative who worked with BEM until September 1983. Mr. Luginbill, whose signature appears at the bottom of the Killion letter, testified that he believed the near-infrared spotlight referred to in the Killion letter was "the prototype infrared illuminator," and not the Streamlight flashlight with an IR filter. Defendant argues that the prototype illuminator referred to by Mr. Luginbill was what both parties call the "smoking model" of the IR illuminator, which used an IR LED to project a beam of infrared light that could be seen through a viewer. The smoking model was plaintiff's earliest version of the device that eventually became the patented illuminator.[2] Defendant argues that Luginbill's testimony shows that plaintiff was offering to sell Killion the same illuminator for which plaintiff ultimately received patent protection.

Defendant attempts to draw a connection between the device offered in the Killion letter and the device offered and photographed in connection with a September 19, 1983 letter sent to a Mr. Ross Kruglak, another BEM customer. Defendant references BEM work orders from September 6 and September 15, 1983, which indicate that Mr. Killion had purchased a Dark Invader second generation night viewer along with an "infrared spot illuminator." Defendant then points to the September 19 letter to Mr. Kruglak, in which Mr. Meyers indicates he is enclosing pictures of a second generation Dark Invader image intensifier along with an attached infrared spot illuminator. Defendant argues that the physical configuration of the device in the photo refutes any possibility that the infrared spot illuminator was merely a flashlight with an IR filter. Therefore, according to defendant, because the infrared spot illuminator in the photo accompanying the Kruglak letter is not a flashlight, and because the Killion work orders indicate that he had ordered an infrared spot illuminator, the near-infrared spotlight referenced in the August 31 Killion letter must have been a new type of illuminator similar to the one referenced in the Kruglak letter, and not, as plaintiff would have it, a flashlight with an IR filter attached.[3]

---

**2.** It was called the smoking model because the IR LED would burn out after approximately one hour of continuous use.

**3.** Defendant also argues that the Kruglak letter refers to an IR filter as an item that could be purchased separately and used with a Streamlight flashlight. It asserts that the filter appears as a separate item in the photograph. Defendant

contends that because the letter and the photograph made a distinction between an infrared spot illuminator and an IR flashlight and filter, it would be unreasonable to infer that they were one and the same.

Defendant's final argument relates to BEM's November 1983 invoice to Killion. In it, BEM informs Killion that he is receiving a Dark Invader night viewer, but not a infrared spot illuminator. The invoice explains that the infrared spot illuminator is back-ordered because BEM had not received its "infrared emitters." Defendant, citing to Mr. Meyers' deposition testimony, argues that these "emitters" were similar to the IR LEDs used in the smoking model. Meyers testified during his deposition that BEM did not refer to the flashlight and IR filter as an emitter. Defendant argues that this supports the conclusion that the illuminator prepared for Mr. Killion in November of 1983 was the same as the patented IR LED illuminator, and not a flashlight with an IR filter.[4]

In response to defendant's first point, plaintiff argues that the new product described in the Killion letter was the second generation Dark Invader viewer, and that there is nothing in the language of the letter to support defendant's contention that the "near-infrared spotlight" was being touted as a new product.

In response to defendant's second argument, plaintiff offers testimony from another BEM employee, Mr. Patrick. He was shown the Killion letter, and testified that he believed, given the date of the letter, that it referred to the flashlight with IR filter as opposed to the IR LED illuminator. Plaintiff also argues that because Mr. Meyer's deposition testimony states that the IR LED illuminator was not perfected until the following February, it is illogical to assume that it was the product being offered to Mr. Killion in August. Along the same lines, plaintiff contends that Mr. Killion's own correspondence showed that he anticipated delivery of his night-vision device within two weeks of the date of his order, and so it makes no sense to assume that Mr. Killion was trying to buy a product that plaintiff would not perfect until February 1984.

In response to defendant's third argument, plaintiff simply relies on the arguments noted above, and also points out that Mr. Meyers testified that the words "infrared spot illuminator" were sometimes used to describe the flashlight-style illuminator with an IR filter.

Plaintiff offers little in response to defendant's fourth argument regarding the Killion November invoice. In its initial opposition brief, plaintiff asserted in a footnote that it was only because the Varo flashlight was back-ordered that BEM did not deliver the flashlight with IR filter to Mr. Killion as scheduled. Plaintiff implies that the "infrared emitter" in the Killion invoice is a reference to the Varo flashlight. In its response, however, defendant points out that this would contradict Mr. Meyer's testimony that "infrared emitters" referred to IR LEDs of the type used in the patented illuminator, and not the flashlight/IR filter combination.

As to defendant's arguments regarding other sales offers by BEM during late 1983, plaintiff contends that these letters and demonstrations actually involved a different prototype illuminator originally designed for the Federal Bureau of Investigation ("FBI"), but subsequently abandoned.[5] At oral argument, plaintiff's counsel highlighted a series of letters from BEM dating to early 1983 in which BEM personnel referred to a prototype illuminator developed for the FBI and offered to other potential customers at the same time.

---

4. In connection with this argument, defendant also points to a letter from Meyers to a Mr. Paul Gerasimoff of the U.S. Army. The letter, dated November 18, 1983, discusses an infrared spot illuminator that could produce a man-sized spot at a distance of approximately 400 feet. Defendant argues that the characteristics of the illuminator described in the Gerasimoff letter are the same as those described in plaintiff's new product bulletin for the patented illuminator. Defendant also points out that Mr. Meyers admitted during his deposition that the illuminator referenced in the Gerasimoff letter may have been the smoking model. Meyers' testimony, however, is equivocal as to what he was admitting.

5. The parties disagree over whether this FBI illuminator was a bulb-based illuminator, or instead used some form of IR emitter to project a beam through its lens system. This distinction may be of some importance in connection with evaluating the effect of the Killion sale, because the November Killion invoice indicated that the illuminator was not being delivered due to the inability to obtain IR emitters, as opposed to a lack of halogen bulbs.

Plaintiff argues that these letters demonstrate an unbroken chain of development for a prototype illuminator that lasted into late 1983, and that much of the 1983 sales activity pointed to by defendant involved this FBI prototype, later abandoned, as opposed to the prototype of the patented illuminator. At oral argument, plaintiff also sought to clarify its position on this issue by arguing that nearly all of the developmental work on the patented illuminator actually took place during a relatively compressed time period in late 1983 and early 1984.

Although defendant has put forward substantial evidence that the patented product was on sale more than one year prior to patenting, there is some contrary evidence. In the end, the issue as to what was for sale is one of fact, and it is contested. Proper evaluation of the evidence requires the court to assess the credibility of witnesses and to draw inferences from sometimes conflicting pieces of documentary evidence. The court therefore cannot appropriately enter summary judgment in favor of either party in connection with defendant's first theory of invalidity.

*Surrender and Recapture*

Defendant's second theory is that plaintiff's patent is invalid because it allegedly recaptures subject matter surrendered by plaintiff during prosecution of its original patent. Defendant alleges that plaintiff surrendered subject matter regarding its pulsing diode during its initial application, and then deleted the same limitations while seeking approval for its reissue claims. *See Mentor Corp. v. Coloplast, Inc.*, 998 F.2d 992, 995–96 (Fed.Cir.1993) (discussing "recapture rule," which prohibits patentee from using reissue process to regain protection for subject matter surrendered during original prosecution). Plaintiff argues that the entire pulsing diode limitation was unnecessary to begin with, and that the only surrendered subject matter relates to limitations added to the original and unnecessary pulsing diode limitation. Therefore, plaintiff argues, it was free to remove the entire pulsing diode limitation, which by definition includes the added limitations, from its broadening reissue claim. This left plaintiff free to protect what

the PTO examiner indeed found to be an independent invention, namely a light source that, when funneled through a particular lens system, was capable of projecting a beam having a well defined peripheral edge.

■ A party may broaden its patent while applying for a reissue claim. The law does not, however, permit attempts to recapture subject matter affirmatively surrendered during the initial patent prosecution, particularly where the purpose of surrender was to distinguish the claimed invention from the prior art. *See Mentor Corp.*, 998 F.2d at 995–96.

■ The first step in applying the recapture rule is determining "whether and in what respect the reissue claims are broader than the original patents." *See Hester Industries, Inc. v. Stein*, 142 F.3d 1472, 1480 (Fed.Cir.1998). The second step is to determine whether the broader aspects of the reissue claim relate to subject matter surrendered during the prosecution of the original patent. *See id.* Determining whether a reissue claim is broader than a canceled claim involves more than simply counting the number of claim elements or claim limitations. *See Ball Corp. v. United States*, 729 F.2d 1429, 1436 (Fed.Cir.1984). If a reissue claim broadens a patent in a way that does not attempt to recapture what was surrendered earlier, the recapture rule does not apply. *See Mentor Corp. v. Coloplast, Inc.*, 998 F.2d 992, 996 (Fed.Cir.1993).

In the present case, the parties agree that the first step towards applying the recapture rule has been satisfied, in that the reissue claims are broader than the original claims for which plaintiff received patent protection. Indeed, plaintiff concedes that the entire purpose in seeking the reissue patent was to broaden the protection it had obtained in the original patent. The dispute concerns whether the broader aspects of the reissue claim attempt to recapture subject matter surrendered during the prosecution of the original patent.

In this case, plaintiff surrendered the right to have patent protection for a generic pulsing circuit in its original claim, because such pulsing circuitry was already taught by the

prior art, specifically Kaplan 4,290,043 and Laughlin 4,129,780. Plaintiff distinguished the prior art by adding two limitations: (1) that the circuit would pulse on and off at intervals that resulted in it being off more often than on; and (2) that the pulsing circuit, when on, would pulse at a substantially higher level of power than it would be able to sustain if left on continuously. These limitations are referred to by the parties as the pulsing diode and substantial pulsing current limitations, respectively. Plaintiff's initial patent application included a pulsing circuit element in each of its independent claims. Plaintiff added these limitations to its independent claims because the patent examiner believed that plaintiff's original proposed pulsing circuitry was too close to the prior art to receive patent protection. In adding these limitations, plaintiff surrendered the right to receive patent protection for pulsing circuitry that did not include these features. In essence, plaintiff conceded that more generic forms of pulsing circuitry had already been patented by other inventors.

■ Subsequent to receiving its original patent, BEM, acting within the appropriate time period as defined by statute, petitioned for reissuance of the patent in broader form, on the grounds that BEM's attorney had not claimed all of the inventions actually disclosed in the original application. Such a "broadening reissue" is permitted pursuant to 35 U.S.C. § 251, and the reissue statute is to be construed liberally. *See In re Weiler*, 790 F.2d 1576, 1579 (Fed.Cir.1986). During the course of prosecuting its reissue claims, plaintiff contended, and the PTO examiner ultimately agreed, that a lens apparatus that produced a beam with a well-defined peripheral edge was in fact a separate invention eligible for patent protection, independent of whatever type of pulsing circuitry might be used in combination with the lens system in any particular device. In order to receive protection for this aspect of its invention, plaintiff had to delete *any* reference to pulsing circuitry in the reissue claims. Of course, in doing so, plaintiff deleted the specific pulsing diode and substantial pulsing current limitations that had been added to its original claim to distinguish the prior art.

■ Contrary to defendant's argument, plaintiff's deletion of the pulsing diode and substantial pulsing current limitations did not effect an improper recapture of surrendered subject matter. The subject matter protected in the new independent reissue claims dealt only with the lens system; it had nothing to do with any type of pulsing circuitry. During the original patent prosecution, the examiner made plaintiff aware that it could not receive protection for its basic pulsing circuit design because such pulsing circuitry was already taught by the prior art. In this regard, nothing changed after the reissue process. Plaintiff still cannot rely on its reissue claims to protect any type of pulsing circuit design that is taught by the prior art, and therefore plaintiff has not used the reissue process to improperly recapture subject matter surrendered during the original prosecution. Accordingly, defendant's motion for summary judgment on the recapture issue is denied, and plaintiff's cross-motion for summary judgment on the same issue is granted.

*"Original patent" requirement*

Defendant also alleges that plaintiff's patents are invalid for failing to comply with the "original patent" clause of 35 U.S.C. § 251. Section 251 requires that a reissue patent be granted "for the invention disclosed in the original patent." Defendant argues that plaintiff's original patented device required a pulsing circuit in order to function, and that the absence of such pulsing circuitry makes reissue claims 35 through 46 invalid. Defendant contends that nothing in the original patent disclosed to anyone skilled in the art how to build an illuminator without using a pulsing circuit, and thus the reissue claims improperly extend patent protection to an invention that is different from the one described in BEM's original patent application.

Plaintiff responds that the device protected in the broadest reissue claim, claim 35, is adequately described in the original patent application specifications. Claim 35 of the reissue patent covers:

> A device for illuminating a target with a beam of electromagnetic radiation to enhance the quality of an image of a target

produced by a passive visible light intensifier and image enhancer, said device comprising: a housing; a source of said electromagnetic radiation in said housing; and a lens system in said housing and aligned with said source for forming the energy emitted from said source into a beam with a well defined peripheral edge.

Defendant focuses its argument largely on the reference to "a source of said electromagnetic radiation in said housing," arguing that the reissue patent improperly allows this limitation to substitute for the more specific limitations regarding a pulsing light source described in the original patent claims. Plaintiff responds by arguing that an essential element of BEM's invention protected by claim 35 is "the combination of an infrared emitter aligned with a lens system in an illuminator housing." Plaintiff insists that the patent examiner acted properly in granting the independent reissue claims, because an invention having this combination of elements could be reduced to practice by someone skilled in the art following a review of the original patent specification.[6]

■ The description of plaintiff's device in the independent reissue claims incorporates four basic elements: a housing, a source of electromagnetic radiation in said housing, and a lens system arranged in such a way that the light from the source of radiation is focused into a beam having a well-defined peripheral edge. These four elements can be extracted from the original patent specification, but the original specification was far more specific with respect to the source of the beam. Rather than referencing "a source of electromagnetic radiation," the independent claims described in the original specification referenced a control circuit that pulsed an IR LED on and off in a

particular manner. In determining whether the new claims are for the invention originally disclosed in the first application, the court must examine the entirety of the disclosure and decide whether, through the "objective eyes" of someone having ordinary skill in the art, plaintiff could fairly have claimed the newly submitted subject matter in the original application, but for the inadvertent error that is the basis for the reissue claim. *See In re Amos*, 953 F.2d 613, 618 (Fed.Cir.1991).

■ As applied to the pending motion, the relevant inquiry is whether someone skilled in the art, after reviewing plaintiff's disclosure in connection with its original application, would have considered the pulsing of the diode a necessary or critical element of plaintiff's basic invention. *See In re Peters*, 723 F.2d 891, 893–94 (Fed.Cir.1983). This determination involves "an essentially factual inquiry confined to the objective intent manifested by the original patent." *See In re Rowand*, 526 F.2d 558, 560 (CCPA 1975). The court, however, has not heard testimony on this issue, nor have the parties submitted expert affidavits discussing how someone skilled in the art would have evaluated the necessity of pulsing at the time of plaintiff's original disclosure. Summary judgment, therefore, cannot properly be granted in favor of either party on this issue.

*Reissue declarations*

■ Defendant's final theory is that plaintiff's reissue claims are invalid because the reissue declarations filed by Mr. Meyers in support of those claims lack sufficient detail. Defendant argues that plaintiff's declarations must show when and why the error in its original patent application arose, as well as how and when the alleged error was discovered. *See Hewlett–Packard Co. v.*

---

**6.** Although not dispositive at this stage, the court notes that there is significant tension between plaintiff's arguments on the "original patent" theory and the "on-sale bar" theory. Plaintiff attempts to avoid the on-sale bar, in part, by arguing that any sales activity in 1983 was irrelevant, because the invention was not ready for patenting until BEM had solved the burnout problem in early 1984. The mechanism used to prevent the diode from burning out was the pulsing control circuit described in the independent claims of plaintiff's original patent. This pulsing control circuit, however, was removed from the independent reissue claims. Plaintiff justifies this removal as consistent with the "original patent" requirement by arguing that "an invention having this combination of elements" (i.e., one that does not include pulsing) "can be made from a review of the [original] patent's specification." This appears to contradict plaintiff's argument that its illuminator was not ready for patenting until after BEM had successfully incorporated the pulsing control circuit into the original device.

*Bausch & Lomb, Inc.,* 882 F.2d 1556, 1565 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1990). Plaintiff acknowledges that its reissue declarations must contain such information, but contends that it has satisfied the requirements of 35 U.S.C. § 251 and its implementing regulations dealing with reissue declarations. *See* 37 C.F.R. § 1.175 (1989).

The court concludes that plaintiff's declarations are sufficient. Initially, the court notes that the declarations were reviewed and approved by the PTO, and that deference should be afforded to the PTO's decision in this regard. *See Akzo,* 810 F.2d at 1150–51. Mr. Meyers, BEM's founder and president, filed an initial declaration in which he explained that the attorney who prepared and filed the original specification failed to recognize that the subject matter covered in the independent reissue claims was not disclosed or made obvious by the prior art at the time of the original application. Such a recitation is generally sufficient to satisfy the "error" requirement of section 251. *See Hester Industries, Inc.,* 142 F.3d at 1479–80 ("One of the most commonly asserted 'errors' in support of a broadening reissue is the failure of the patentee's attorney to appreciate the full scope of the invention during the prosecution of the original patent application. This form of error has generally been accepted as sufficient to satisfy the 'error' requirement of § 251.") (internal citations omitted).

Defendant seeks further explanation of how the error arose, but, citing *In re Amos,* 953 F.2d at 615, admits that "an acceptable declaration" could simply have explained that the alleged error was due to an oversight by the prosecuting attorney. The court, however, sees no meaningful distinction between the "attorney oversight" explanation accepted in *Amos* and plaintiff's allegation that its attorney "failed to recognize" the proper scope of the invention.

██ Defendant, relying on *In re Constant,* 827 F.2d 728 (Fed.Cir.1987), also complains that plaintiff's declarations do not fully specify and discuss each unnecessary limitation present in the original claims and omitted from the reissue claims. As plaintiff points out, however, *Constant* simply re-

quires the patentee to identify the differences between the original claims and the reissue claims, and it does not require the patentee to frame the discussion solely in terms of necessary and unnecessary limitations. Plaintiff's supplemental reissue declaration undertook a line-by-line identification of the differences between the original claims and the reissue claims, and the level of detail provided in the supplemental declaration is sufficient to satisfy the requirements of section 251. Accordingly, defendant's cross-motion for summary judgment on this theory is denied, and plaintiff's cross-motion for summary judgment is granted.

## CONCLUSION

The parties' cross-motions for summary judgment in connection with the on-sale bar theory and original patent theory of invalidity are denied. Plaintiff's cross-motion for summary judgment is granted with respect to the recapture theory of invalidity and the sufficiency of plaintiff's reissue declarations. On or before August 18, 2000, the parties are directed to provide the court with a joint status report outlining a proposed schedule for further proceedings.