# United States Court of Appeals for the Federal Circuit

03-5169

SPARTON CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Steven Kreiss, of Washington, DC, argued for plaintiff-appellant.

Gary L. Hausken, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, and John J. Fargo, Director.

Appealed from: United States Court of Federal Claims

Chief Judge Edward J. Damich

# United States Court of Appeals for the Federal Circuit

03-5169

SPARTON CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  February 28, 2005

_____

Before MICHEL, <u>Chief Judge</u>,<sup>*</sup> ARCHER, <u>Senior Circuit Judge</u>, and SCHALL, <u>Circuit Judge</u>.

ARCHER, <u>Senior Circuit Judge</u>.

Sparton Corporation ("Sparton") appeals the Court of Federal Claims' ("Claims Court") grant of summary judgment of invalidity under the on-sale bar of 35 U.S.C. § 102(b).  <u>Sparton Corp. v. United States</u>, No. 92-580C (Fed. Cl. Jul. 15, 2003).  Because the invention of U.S. Patent Nos. 3,921,120 and 4,029,233 ("the '120 patent" and "the '233 patent") was not the subject of a commercial offer for sale more than one year prior to the effective filing date of these patents ("the critical date"), we reverse the judgment of the Claims Court and remand for further proceedings.

_____

<sup>*</sup>        Paul R. Michel assumed the position of Chief Judge on December 25, 2004.

Background

In 1969, the Navy entered into a contract with Sparton for the procurement of the AN/SSQ-53 DIFAR (Directional Frequency Analysis and Recording) sonobuoy.[1] This sonobuoy is an electroacoustic device used to detect, locate, and classify the source of underwater sounds, such as those generated by submarines. '120 pat., col. 1, ll. 11-13. In its original configuration, the SSQ-53 deployed only to a depth of 90 feet and could detect submarines down to approximately 1000 feet.[2] In response to the Soviet Union's development of technology that permitted its submarines to dive deep beneath the ocean's isothermic layers, and therefore become undetectable by the SSQ-53s, the Navy sought to acquire a sonobuoy capable of functioning at both a shallow depth and a deeper depth of 500 feet or 1000 feet ("dual depth").

On March 17, 1971, Sparton submitted an Engineering Change Proposal ("ECP") 0465-2 to the Navy under its existing contract, proposing to incorporate dual depth operating capability into the existing SSQ-53 DIFAR sonobuoy by modifying the design to incorporate an inverse deployment system. The sonobuoy device described in the ECP included a multi-piece release plate for either retaining or deploying the sonobuoy internal components within or from the sonobuoy housing. However, shortly after the ECP was issued, Sparton developed, and later tested, a sonobuoy having a single-piece release plate. This single-piece release plate performed better than previous

---

[1]     Other contractors were also SSQ-53 sonobuoy suppliers; however, the facts surrounding their involvement are not relevant to this appeal.
[2]     This was due to the fact that submarines below 1000 feet were below the oceanic isothermic layers, and these layers prevented or impaired the transmission of submarine acoustic signals.

release plates and was ultimately used in the modified SSQ-53s Sparton delivered to the Navy under the contract.

On March 29, 1973, Sparton filed a patent application relating to a dual depth sonobuoy design. The '120 patent issued as a result and is directed to a sonobuoy deployment system. Sparton then filed a divisional application resulting in the '233 patent, which is drawn to a sonobuoy release plate. Both patents contain claim limitations drawn to a single piece release plate for a sonobuoy.

In 1992, Sparton filed suit in the Claims Court against the United States ("government") to recover money damages under 28 U.S.C. § 1498(a) for the government's unlicensed use of its inventions protected by the '120 and the '233 patents. The government maintained that the patents were invalid under the on-sale bar of 35 U.S.C. § 102(b) and moved for summary judgment of invalidity. The Claims Court found that the subject matter of the '120 and '233 patents was offered for sale before the critical date. Sparton, No. 92-580C, slip op. at 2. The court also found that the experimental use exception did not help Sparton, as Sparton's sale of the device at issue was primarily for commercial, not experimental, purposes. Id. As such, the Claims Court granted the government's motion, ruling that the patents were invalid in view of the on-sale bar.

Sparton now appeals, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

Analysis

We review a Claims Court grant of summary judgment de novo, Monon Corp v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001). Although the ultimate

determination of whether a patent is invalid under 35 U.S.C. § 102's on-sale bar is a question of law, this determination is based upon underlying factual considerations. Id.

In order for a patent to be held invalid under the on-sale bar, two conditions must be satisfied before the critical date:

> First, the product must be the subject of a commercial [sale] or offer for sale. . . . Second, the invention must be ready for patenting. That condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.

Pfaff v. Wells Elec., Inc. 525 U.S. 55, 67-68 (1998). While the Supreme Court has not explained what is necessary for a "commercial offer for sale," we have held that two elements are necessary. Namely, a court must find that (1) there was a "commercial offer"; and (2) that offer was for the patented invention. Scaltech, Inc. v. Retec/Tetra, L.L.C., 269 F.3d 1321, 1328 (Fed. Cir. 2001). Here, the Claims Court found that all the requirements for the on-sale bar were met. We disagree. We hold that the patented invention of neither the '120 nor the '233 patent was the subject of the admitted offer for sale prior to the critical date.[3]

The alleged offer for sale in this case is Sparton's March 17, 1971 submission of an ECP proposing to incorporate dual depth operating capability into the existing SSQ-53 design. The ECP included a description of the dual depth sonobuoy deployment design, including drawings. This description and drawings contained a release plate mechanism. The parties disagree as to what type of release plate was identified. The

---

[3] Because we hold that the first prong of the Pfaff test was not satisfied, we need not reach the second Pfaff prong.

specific release plate mechanism proposed in the ECP is not relevant to our analysis, because, as the Claims Court noted,

> the government concedes, and the parties do not dispute, the release plate mechanism described in the '120 and '233 patents is not the release plate that was part of the original design proposed in the ECP; in other words, the . . . Contract does not include a release plate that meets the description of the release plate limitation of the claimed inventions.

Sparton, No. 92-580C, slip op. at 19. This fact is of utmost importance, as both sides agree that what was offered in the ECP was not the patented invention. Additionally, there is no evidence of any communication between Sparton and the government that a release plate mechanism different from that described in the ECP was going to be used in the sonobuoys. Accordingly, there is nothing to suggest that prior to the critical date of March 29, 1972, Sparton made an offer for anything other than dual-depth sonobuoys having the release plate mechanism described in the ECP. See Miller v. United States, 62 F. Supp. 327, 334 (Ct. Cl. 1945) (stating "[a]n offer is not made until it is communicated to the offeree").

Indeed, our precedent supports this determination. See Tec Air, Inc. v. Denso Mfg. Mich., Inc., 192 F.3d 1353, 1358-59 (Fed. Cir. 1999). In Tec Air, the plaintiff offered a plastic fan for sale on two separate occasions prior to the critical date. Id. at 1356-57. In its offers, Tec Air did not specify the balancing plugs to be included on the fans. Further, Tec Air did not intend to use the patented plugs at the time it made the offers. Based on this, we held "the jury reasonably could have found that Tec Air's offers . . . did not raise the on-sale bar because the subject matter of [those] offers [did] not fully anticipate the claimed invention" under the first prong of the Pfaff test. Id. at 1358. The situation here is similar: Sparton offered a dual-depth sonobuoy for sale

03-5169                                                     5

with the release plate described in the ECP but did not disclose the patented release plates that were ultimately included in the device delivered under the contract. As such, we conclude that it was not possible for Sparton's offer under the ECP to include the patented single part release plate and that Sparton's offer under the ECP, therefore, fails the first prong of the Pfaff test.

Further, we are not persuaded by the government and the Claims Court's invocation of contract principles in this instance. The Claims Court adopted the government's position that because the ECP did not preclude a different design of the release plate, the U.C.C. permitted Sparton to substitute any release plate capable of performing the function recited in the ECP. As such, the court concluded that the sonobuoys would be considered conforming goods under the contract. See U.C.C. §§ 2-106, 2-311. The court further concluded that the ECP was a contract for future goods under U.C.C. § 2-106(1) and that when the Navy accepted the sonobuoys with the single part release plate upon delivery, Sparton's duty was discharged under the terms of the ECP.

As the Claims Court pointed out, our precedent encourages reference to contract principles to resolve the question of whether there was a commercial offer for sale. See Group One v. Hallmark Cards, Inc, 254 F.3d 1041, 1047 (Fed. Cir. 2001) (stating "we hold that the question of whether an invention is the subject of a commercial offer for sale is a matter of Federal Circuit law, to be analyzed under the law of contracts as generally understood."). However, the Claims Court improperly applied the U.C.C. to the facts of this case. Specifically, the court read the ECP as including the single part

release plate based upon the Navy's acceptance of the dual depth DIFAR sonobuoys with a single part release plate.

Under the Claims Court's analysis, the patented single part release plate was the subject of an offer for sale before it was even conceived. Such a result is illogical. The court even noted that such an outcome would defy logic at the outset of its opinion. <u>Sparton</u>, No. 92-580C, slip op. at 18 ("Logic dictates, however, that a device that does not completely exist cannot be the subject of an offer for sale."). The court thus improperly reached an unwarranted result by relying on contract principles.

The court and government work to lessen the blow of this outcome by using our <u>Robotics</u> cases to argue that any incipient on-sale bar was solidified by the development of the claimed sonobuoys prior to the critical date. In <u>Robotics Vision Systems, Inc. v. View Engineering, Inc.</u>, 112 F.3d 1163, 1168 (Fed. Cir. 1997) ("<u>Robotics II</u>"), we explained that "[c]ompletion of the invention prior to the crucial date, pursuant to an offer to sell that invention would validate what had been theretofore an inchoate, but not yet established bar." While <u>Robotics II</u> was a pre-<u>Pfaff</u> case, in <u>Robotics Vision Systems, Inc. v. View Engineering, Inc.</u>, 249 F.3d 1307, 1313 (Fed. Cir. 2001) ("<u>Robotics IV</u>"), we cited this language favorably. However, <u>Robotics IV</u> dealt only with the second prong of the <u>Pfaff</u> on-sale bar test, because the district court had previously determined that a commercial offer for sale had taken place more than one year before the critical date. As such, <u>Robotics IV</u>'s relevance, if any, is greatly diminished. Additionally, there is a significant factual difference between the present case and the <u>Robotics</u> cases. In the <u>Robotics</u> cases, the invention had already been conceived prior to the offer for sale, but the invention "was still in a developmental

stage." Robotics II, 112 F.3d at 1164. Here the patented invention had not yet been conceived when the alleged offer for sale took place. "Plaintiff asserts that conception of the patented release plate did not occur until after Mod. 4 was adopted, and this fact is not disputed by Defendant for purposes of summary judgment," Sparton, No. 92-580C, slip op. at 16. In the Robotics cases, there was the potential that an on-sale bar could develop, because the invention had at least been conceived. That is not the case here. With no conception of an invention, there cannot be an offer for sale or a sale of that invention. Finally, the language used in the Robotics cases is "pursuant to an offer to sell that invention." Robotics IV, 249 F.3d at 1313 (quoting Robotics II, 112 F.3d at 1168). As we have explained above, absent any communication between Sparton and the Navy after the issuance of the ECP, the only offer for sale was of the unpatented release plate and not that claimed in the '120 and '233 patents. Accordingly, the Robotics cases are inapposite.

## Conclusion

Because we hold that the March 17, 1971 ECP was not an offer for sale of the patented device, we reverse the Claims Court's judgment and remand the case for further proceedings.[4]

REVERSED and REMANDED.

---

[4] Our reversal of the applicability of the on sale bar of § 102 does not, however, settle all issues as to the validity of the '120 and '233 patents. Under the March 30, 1998 order by the Claims Court, no findings have been made as to whether the release plate described in the ECP would have rendered the claimed invention obvious by its addition to the prior art. This is still an open issue before the Claims Court.